1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SCOTT BRUMETT,

    Petitioner,         No. C 04-05423 JSW

  v.              **ORDER DENYING PETITION FOR**
                **WRIT OF HABEAS CORPUS**
A.P. KANE, Warden, et al.,

    Respondents.
_____/

**INTRODUCTION**

   Now before the Court is the petition for a writ of habeas corpus pursuant to 28 U.S.C.

§ 2254 filed by Petitioner Scott Brumett ("Brumett").  The petition is now ripe for consideration

on the merits and, for the reasons set forth below, the Petition is DENIED.

**BACKGROUND**

**A.**  **Procedural History.**

   On November 24, 1993, Brumett was convicted by a jury of one count of murder in the

second degree; gross vehicular manslaughter while intoxicated; driving with a blood alcohol level

in excess of .08% and causing injury to Wendy Holtz; and driving when privilege suspended for

prior convictions of driving under the influence.  (Second Amended Pet. ("Pet.") at 14-15.)  The

jury also found that Brumett caused death or bodily injury to more than one victim and had prior

misdemeanor DUI convictions.  (*Id.*)  Brumett subsequently was sentenced to an indeterminate

sentence of fifteen years to life.  (*Id.*)  Brumett currently is confined at a California Correctional

Training Facility in Soledad, California.  Brumett does not contest his conviction or the resulting

1  sentence.  Rather, he seeks habeas relief based upon the denial of parole at his first suitability

2  hearing, which was held on September 20, 2002 ("the Hearing").

3          On August 14, 2003, the Superior Court of California for the County of Los Angeles

4  denied Brumett's state habeas petition with the sole explanation that the decision was supported by

5  some evidence.  (Answer, Ex. 8.)  On September 8, 2004, the California Court of Appeal denied

6  Brumett's petition stating that "Petitioner's representation [] that a complete record of the

7  administrative proceedings is included in the record does not satisfy the requirements of *People v.*

8  *Duvall,* 9 Cal. 4th 464, 474 (1995)."  (Answer, Ex. 12.)[1]  The Court of Appeal also denied the

9  petition on the merits concluding that the record "reflects some evidence to support the challenged

10 decision."  (*Id.*)  On December 1, 2004, the California Supreme Court summarily denied review of

11 Brumett's state habeas petition.  (Answer, Ex. 14.)

12         Brumett filed his original petition with this Court in December of 2004.  Respondent filed a

13 motion to dismiss in June 2005, after which Brumett filed his first amended petition in July 2005.

14 Respondent filed a second motion to dismiss in November 2005, which this Court granted.

15 Brumett filed a second amended petition in October 2006.  The Court denied Respondent's

16 subsequent motion to dismiss and ordered Respondent to address Brumett's claims.  On August 3,

17 2007, Respondent filed his Answer to the Order to Show Cause.  Brumett then filed a Traverse on

18 October 3, 2007.

19 **B.     Factual Background.**

20         The following facts are derived from the California Court of Appeal opinion as found by

21 that court on direct appeal from Brumett's trial.  Although Brumett does not challenge his

22 conviction, the facts underlying that conviction are pertinent to the resolution of his habeas

23 petition and are set forth as follows:

24         Viewed in accordance with the usual rules on appeal (People v.
25         Ochoa (1993) 6 Cal. 4th 1199, 1206), the evidence established prior to May

26         [1]     This was the second petition filed in the court of appeals, the first having
   been denied for an alleged failure to "present a complete record of the administrative proceedings
27 and the trial court proceedings." (Appendix A to Petition, ("Pet. App. A"), Ex. E.)

28

5, 1987, defendant was convicted of drunk driving after he lost control of his car in the rain and crashed. Thereafter, from May 5, 1987, through August 5, 1987, defendant participated in a first offender program for persons convicted of driving under the influence. The program informed defendant of the dangers of driving under the influence.

Some time prior to February 25, 1988, defendant was once again convicted of driving under the influence and this time participated in a year-long second offender program. In that program, defendant was exposed to similar information as was taught in the first offender program. While he was participating in the second offender program, defendant was arrested for a third drunk driving offense. He did not inform the director of this incident.

According to the program director, defendant was repeatedly told that by drinking and driving, he risked killing someone.

Nevertheless, defendant was apparently intoxicated at 4 p.m. on February 19, 1993, when he went to the Sunshine Childcare Center in Valencia to pick up his eight-year-old daughter, Brittany. [Footnote omitted] Cheryl Espinosa, the site director of the school informed defendant that Brittany was not there. Espinosa noticed that defendant's speech was slurred and that he was swaying back and forth. Defendant was chewing gum and Espinosa could not smell any alcohol on his breath, but she believed he was drunk and should not be driving. Concerned, Espinosa telephoned Deaner to request permission to remove defendant from the list of persons authorized to pick Brittany up from the school. In response to Espinosa's telephone call, and fearing that defendant was drunk, Deaner called the Sheriff's Office to inquire whether he could refuse to put Brittany into defendant's car. Deaner never had to make that decision.

At approximately 4:15 p.m. that afternoon, Jose Carrillo was traveling east on Placerita Canyon Road at about 35 miles an hour behind a white Escort. Carrillo recalled that it was drizzling and the road was wet and slick at the time. About half a mile east of Highway 14, Carrillo saw a light blue car traveling towards the white Escort at about 55 miles an hour. As the blue car came around the curve, it crossed the double lines and hit the left front of the white Escort. The white Escort went over the embankment and down the hill while the blue car spun around and stopped crossways along the road. When Carillo stopped his own car, he saw defendant sitting in the driver's seat of the blue car. Another car subsequently arrived and also stopped. That driver stayed at the scene while Carrillo went for help.

Within a few minutes Carrillo located city employee Norman Sieger. Sieger used his radio to advise other units of the accident, then followed Carrillo to the accident site. There, defendant told Carrillo that the white Escort had veered to the left and caused the collision. Based on the way defendant spoke and acted, Carrillo formed the opinion that defendant was drunk.

Sieger observed that defendant had blood on his shirt. When Sieger asked defendant whether he was alright, defendant responded, "yeah, I think I hit somebody." Sieger noticed that defendant's speech was slurred and he was swaying from side to side; his eyes were glassy and his pupils were dilated.

While he was speaking to defendant, Sieger heard a child crying in the ravine below. Carrillo also heard children crying. When he later looked down the hill to where the Escort had fallen, he saw defendant standing next to the car while other people tried to help the occupants of the car.

That same afternoon, Kurt Brewer was driving west on Placerita Canyon Road when he came across the accident scene. He pulled onto the left shoulder and saw defendant get out of the driver's seat of a light blue or gray car, walk to the side of the road, and toss between 6 and 12 silver cans over the side of the hill. Brewer then accompanied Sieger down the hill to the white Escort. There, Brewer observed a two-year-old girl in the back seat, a little boy in the front passenger seat and a woman in the driver's seat. The woman was not breathing. The boy was unconscious and bleeding from a head wound, but was breathing. The girl was conscious. Sieger and Brewer took the children out of the car and brought them back up the hill.

Deputy Sheriff Amos Cisneros and paramedic Robert Foster arrived at the scene together. Foster observed defendant, who appeared uninjured, apparently tossing a silver can over the embankment. While Foster went to tend to the other victims, Cisneros addressed the crowd of bystanders and asked the driver of the blue car to step forward. When no one responded, Cisneros walked towards the car. Defendant stood up at the rear of the vehicle, but did not immediately identify himself as the driver. Cisneros observed a cardboard container with beer cans behind the rear bumper of the car. Defendant walked towards Cisneros with an unsteady gait and Cisneros detected alcohol on defendant's breath. Cisneros also noted that defendant's eyes were red and bloodshot and that his speech was slow and deliberate. Cisneros concluded that defendant was under the influence of alcohol. Observing that defendant's arm was bleeding, Cisneros asked defendant how he had sustained this injury and defendant admitted that he was the driver of the blue car. When Cisneros asked for a driver's license, defendant gave him an identification card, not a driver's license.

Meanwhile, Foster was evaluating the injuries of the other victims. He noted that the little girl who had been taken from the white Escort, Paige Holtz, appeared to have no severe injuries. The little boy, Joshua Holtz, however, had a serious skull fracture. While a bystander monitored the boy's respiration, Foster went down the hill to the Escort. He observed heavy damage to the front and driver's side of the car. The woman in the driver's seat, Wendy Holtz, had two broken legs and was not breathing. Foster concluded that she was dead.

While Foster was examining Wendy Holtz, the bystander who had been monitoring Joshua's condition yelled to Foster that the boy had stopped breathing. Foster quickly returned to Joshua and saw that his lips were blue. Foster concluded that there was internal head bleeding. He initiated CPR and Joshua started to breathe again. Although Joshua regained consciousness a minute later, his vital signs remained poor. While Foster worked on the boy, he heard defendant say to Cisneros, "Why isn't that paramedic working on me. When will he come over and check me out?" When Foster finished with Joshua and Paige, he went to defendant and observed that defendant had a superficial arm wound. Foster smelled alcohol on defendant's breath.

California Highway Patrol Officer John Grindey interviewed defendant at the scene of the accident. Defendant told Grindey that he was going to pick up his daughter. Defendant knew that he was driving with a

4

United States District Court
For the Northern District of California

1
2
3
4
5
6
7

suspended license, but claimed he had no choice because he had to go to work. Defendant claimed to remember only that the white Escort came over the line and hit defendant's car head-on. Grindey noted that defendant's speech was slurred, his eyes were red and glassy and his breath smelled like alcohol. Defendant failed the several field sobriety tests Grindey asked him to perform. Defendant told Grindey that he had had only three to four light beers and claimed to have had no alcohol since 3:00 p.m. He denied having anything to drink after the accident. Grindey concluded that defendant had been driving under the influence at the time of the collision. Before leaving the scene, Grindey noticed several cans of Coors Light strewn behind defendant's car. When fire specialist Richard Waugh arrived at the scene, he also noticed empty beer cans and one full can of beer on the embankment.

8
9
10
11

California Highway Patrol Officer David Moeller eventually transported defendant to the hospital to obtain a blood sample. At 5:44 p.m., a sample was taken. Testing revealed that defendant's blood alcohol content was 0.27 percent. Paul Kayne, a criminalist with the Sheriff's Crime Laboratory, opined that a person with a blood alcohol level of .27 percent at 5:45 p.m. would be impaired while driving a vehicle at 4:15 p.m. He also opined that a person with a blood alcohol level of .27 percent at 5:45 p.m. would have had a blood alcohol level of at least .08 at 4:15 p.m.

12
13
14
15

Based upon his investigation, California Highway Patrol Officer Robert Koetting, a collision causation expert, opined that the accident was caused by defendant driving at an unsafe speed for the conditions then present and making an improper turning movement at that speed. He believed that defendant's blood alcohol level was the primary cause of the collision.

16

(*See* Pet. App. A, Ex. A (California Court of Appeal Opinion at 3-10); Ex. C (Transcript of

17

September 20, 2002 Hearing ("Tr.") at 8:22-17:16).)

18

At the hearing, the Board of Prison Terms ("Board")[2] found Brumett unsuitable for parole

19

and found that he posed an unreasonable risk or danger to society and a threat to public safety if

20

given a release date. The Board gave the following reasons for its decision:

21
22
23
24
25
26
27

The committing [*sic*] offense, the offense was carried out in an especially callous manner. You caused the death of Wendy Holtz because you were driving under the influence of alcohol. You had knowledge, prior knowledge, that you had an alcohol problem and you refused to acknowledge it. There were multiple victims attacked - strike that, or injured and killed in the same incident. ... The offense was carried out in a dispassionate and calculated manner because ... you were driving under a suspended license. You had DUI arrests. You were driving at .0 or zero .0 [*sic*] blood alcohol level. The offense was carried out in a manner which demonstrates exceptionally callous disregard for human sufferings. In terms of leaving these two young children motherless. The motive of the crime was inexplicable or very trivial in relationship to the offense and that's because you just didn't heed the warning signs, that you had a problem, a problem

28

[2]   California has since replaced the Board of Prison Terms with the Board of Parole Hearings. *See* Cal. Penal Code § 5075(a).

5

**United States District Court**
For the Northern District of California

1

with alcohol. ... Previous record, the prisoner has an escalating pattern of criminal conduct. In terms of three arrests for DUI and participation in treatment programming. ... He has an escalating – or strike that, has a history of unstable or tumultuous relationships with others, beginning at an early age. He started drinking around the age of 13, partially because of the loss of a loved one, his father. Around the age of 15, he started drinking daily, sometimes to the point of intoxication. He failed to – previous grants of probation, previous grants of counseling, previous grants of jail time, to acknowledge that you had a problem. And cannot be counted upon to avoid criminality. An unstable social history of criminality which included, as mentioned, convictions for Vehicle Code violations of alcohol. Three of those, DUIs, one hit and run with an injury and driving on a suspended license. Institutional behavior, he has not sufficiently participated in beneficial self-help and therapy programming at this time. The psychosocial report, dated March 29th of 2002, authored by William Gamard, Ph.D., Staff Psychologist, is not totally supportive of release. In that, under the Assessment of Dangerousness ... it states that the prisoner has only one risk factor as precursor for problems in the future, should he be released would be a return to alcoholism.

(Pet. App. A, Ex. C (Tr. at 90:15-92:23; *see also id.* at 95:4-97:15 (setting forth basis for three year denial).)

The Board reviewed the factors that tended to favor suitability, and reviewed Brumett's numerous letters of support from friends and family offering employment and residence upon his release. (*Id.* at 36:13-41:17.) In addition, the Board pointed out that Brumett should be commended because:

he has remained disciplinary free. He hasn't received any 115s in his entire nine years of incarceration. He's participated in the AA/NA 12-Step Program. He participated in Life Skills programming, where he completed and got a certificate. The Impact Program, the Impact Workshop for 13 weeks. He remains as a tutor and an instructor. He just recently completed the Anger Management Program, which is about a 10-week program ... . He's got vocational trades, a Refrigeration and Air Conditioning certificate. And he has a certificate for Type II Refrigerant and Transition Recovery. As well as a Pasteurization license, and he's renewed his Pasteurization license in December of 2001. Positive work reports. He's been in PIA Textiles as a sewing machine operator. He's trying to better himself in terms of education. He's upgrading his ability. He's trying to receive an AA in Business Management.

(*Id.* at 93:25-94:20.)

The Board also noted that Brumett received numerous laudatory chronos for his work on various assignments. (*Id.* at 29:20-30:8.) Indeed, one of the commissioners stated that "the adjustment you've made since you've been incarcerated is as good, if not the best, that I've ever seen. And absolutely, you are to be commended for that." (*Id.* at 98:7-9.)

6

United States District Court

For the Northern District of California

1    The Board deferred Brumett's next parole hearing for three years and recommended that

2    Brumett remain disciplinary free, upgrade both vocationally and educationally, continue to

3    participate in Alcoholics Anonymous ("AA"), and continue to participate in therapy.  (*Id.* at 97:15-

4    98:3.)  With respect to the latter recommendation, the Board found that Brumett needed further

5    therapy "in order to face, discuss and cope with stress in a non-destructive manner, so that he can

6    better understand the causative factors, [of] the things that he did. ... Until progress is made, the

7    prisoner continues to be unpredictable and a threat to others."  (*Id.* at 93:11-21.)

8                                      **ANALYSIS**

9    **A.      Standard of Review.**

10    This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in

11    custody pursuant to the judgment of a state court only on the ground that he is in custody in

12    violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); *see*

13    *also Rose v. Hodges*, 423 U.S. 19, 21 (1971).  The Ninth Circuit has applied § 2254(d) to review of

14    parole suitability decisions.  *See Irons v. Carey*, 505 F.3d 846, 850 (9th Cir. 2007); *Rosas v.*

15    *Nielsen*, 428 F.3d 1229, 1232 (9th Cir. 2005) (per curiam);  *McQuillion v. Duncan*, 306 F.3d 895,

16    901 (9th Cir. 2002).  Because the petition in this case was filed after the effective date of the

17    Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), AEDPA's provisions apply.

18    *Jeffries v. Wood*, 103 F.3d 827 (9th Cir. 1996) (en banc).

19    Under AEDPA, this Court may grant the petition with respect to any claim that was

20    adjudicated on the merits in state court only if the state court's adjudication of the claim: "(1)

21    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

22    established Federal law, as determined by the Supreme Court of the United States; or (2) resulted

23    in a decision that was based on an unreasonable determination of the facts in light of the evidence

24    presented in the State court proceeding."  28 U.S.C. § 2254(d); *see also Williams v. Taylor*, 529

25    U.S. 362, 413 (2000) (hereinafter "*Williams*").  Courts are not required to address the merits of a

26    particular claim but may simply deny a habeas application on the ground that relief is precluded by

27    28 U.S.C. § 2254(d).  *Lockyer v. Andrade*, 538 U.S. 63, 70-73 (2003).  It is the habeas petitioner's

28

United States District Court

For the Northern District of California

1   burden to show he is not precluded from obtaining relief by § 2254(d).  *Woodford v. Visciotti*, 537

2   U.S. 19, 25 (2002).

3   "Clearly established federal law, as determined by the Supreme Court of the United

4   States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of

5   the time of the relevant state-court decision."  *Williams*, 529 U.S. at 412; *Barker v. Fleming*, 423

6   F.3d 1085, 1093 (9th Cir. 2005) ("clearly established" federal law determined as of the time of the

7   state court's last reasoned decision); *Alvarado v. Hill*, 252 F.3d 1066, 1068-69 (9th Cir. 2001).

8   "Section 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's

9   jurisprudence."  *Williams*, 529 U.S. at 412.  The Supreme Court has explained repeatedly that

10  AEDPA, which embodies deep-seated principles of comity, finality, and federalism, establishes a

11  highly deferential standard for reviewing state-court determinations.  *See id.* at 436.  Thus, "[a]

12  federal court may not overrule a state court for simply holding a view different from its own, when

13  the precedent from [the Supreme] Court is, at best, ambiguous."  *Mitchell v. Esparza*, 540 U.S. 12,

14  17 (2003) (per curiam).

15  Under the "contrary to" clause of section 2254(d)(1), a federal court may grant the writ

16  only if the state court "applies a rule that contradicts the governing law set forth in [Supreme

17  Court] cases, 'or if it confronts a set of facts that are materially indistinguishable from a decision'

18  of the Supreme Court and nevertheless arrives at a different result."  *Early v. Packer*, 537 U.S. 3, 8

19  (2002) (quoting *Williams*, 529 U.S. at 405-06).  Under the "unreasonable application" clause of

20  section 2254(d)(1), a federal court may grant the writ if the state court identifies the correct

21  governing legal principle from the Supreme Court's decisions but unreasonably applies that

22  principle to the facts of the prisoner's case.  *Williams*, 529 U.S. at 413.

23  A federal habeas court "may not issue the writ simply because that court concludes in its

24  independent judgment that the relevant state-court decision applied clearly established federal law

25  erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 412.  The

26  objectively unreasonable standard is not a clear error standard.  *Lockyer*, 538 U.S. at 75-76; *Clark

27  v. Murphy*, 331 F.3d 1062, 1067-69 (9th Cir.), *cert. denied*, 540 U.S. 968 (2003).  After *Lockyer*,

28  "[t]he writ may not issue simply because, in our determination, a state court's application of

8

1    federal law was erroneous, clearly or otherwise.  While the 'objectively unreasonable' standard is

2    not self-explanatory, at a minimum it denotes a greater degree of deference to the state courts than

3    [the Ninth Circuit] ha[s] previously afforded them."  *Clark*, 331 F.3d at 1068.

4          In determining whether the state court's decision is contrary to, or an unreasonable

5    application of, clearly established federal law, a federal court looks to the decision of the highest

6    state court to address the merits of a petitioner's claim in a reasoned decision.  *LaJoie v.*

7    *Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000).  If the highest state court has summarily denied a

8    petitioner's claim, the habeas court may "look through" that decision to the last state court

9    addressing the claim in a reasoned decision.  *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th

10   Cir. 2000) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)).

11         In this case, the Court of Appeal denied Brumett's petition in a reasoned decision.  (Pet.,

12   App. A, Ex. H.)  The Supreme Court then summarily denied review of Brumett's petition.  (Pet.,

13   App. A, Ex. I.)  Accordingly, this Court will "look through" the California Supreme Court's

14   decision to the Court of Appeal's decision in deciding whether the state court's decision is

15   contrary to, or an unreasonable application of, clearly established federal law.

16   **B.     Legal Standards Applicable to Parole Suitability Determinations.**

17         California's parole scheme is set forth in California Penal Code § 3041, *et seq.*  Section

18   3041(a) provides, in pertinent part:

19        In the case of any inmate sentenced pursuant to any provision of law ... [o]ne
          year prior to the inmate's minimum eligible parole release date a panel of two
20        or more commissioners or deputy commissioners shall again meet with the
          inmate and shall normally set a parole release date as provided in Section
21        3041.5. ... The release date shall be set in a manner that will provide uniform
          terms for offenses of similar gravity and magnitude in respect to their threat
22        to the public, and that will comply with the sentencing rules that the Judicial
          Council may issue and any sentencing information relevant to the setting of
23        parole release dates.

24   Cal. Penal Code § 3041(a).

25         Penal Code section 3041(b) provides, in pertinent part:

26        The panel or board shall set a release date unless it determines that the
          gravity of the current convicted offense or offenses, or the timing and gravity
27        of current or past convicted offense or offenses, is such that consideration of
          the public safety requires a more lengthy period of incarceration for this
28        individual, and that a parole date, therefore, cannot be fixed at this meeting.

9

Cal. Penal Code § 3041(b).

Title 15 of the California Code of Regulations section 2402 (hereinafter "Section 2402") sets forth the criteria used to determine whether an inmate is suitable for release on parole. The opening paragraph of Section 2402(a) states:

> Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

15 Cal. Code Regs. § 2402(a).

Section 2402(b) provides:

> All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any considerations of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

*Id.* § 2402(b).

Circumstances tending to show unsuitability for parole are:

(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:

    (A) Multiple victims were attacked, injured or killed in the same or separate incidents.

    (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

    (C) The victim was abused, defiled or mutilated during or after the offense.

    (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

    (E) The motive for the crime is inexplicable or very trivial in relation to the offense.

(2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

United States District Court

For the Northern District of California

(3) Unstable Social History.  The prisoner has a history of unstable or tumultuous relationships with others.

(4) Sadistic Sexual Offenses.  The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors.  The prisoner has a lengthy history of severe mental problems related to the offense.

(6) Institutional Behavior.  The prisoner has engaged in serious misconduct in prison or jail.

*Id.* § 2402(c).

Circumstances supporting a finding of suitability for parole are:

(1) No Juvenile Record.  The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History.  The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse.  The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands that nature and magnitude of the offense.

(4) Motivation for Crime.  The prisoner committed his crime as a result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome.  At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was a result of that victimization.

(6) Lack of Criminal History.  The prisoner lacks any significant history of violent crime.

(7) Age.  The prisoner's present age reduces the possibility of recidivism.

(8) Understanding and Plans for Future.  The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior.  Institutional activities indicate an enhanced ability to function within the law upon release.

*Id.* § 2402(d).

The regulations also contain a matrix of suggested base terms depending on the murder degree and the circumstances surrounding the murder.  The matrix provides three choices of

11

suggested base terms for several categories of crimes.  *See id.* § 2403.  For second degree murders, the matrix of base terms ranges from the low of 15, 16, or 17 years, to a high of 19, 20 or 21 years, depending on some of the facts of the crime.[3]

Although the matrix is to be used to establish a base term, an inmate's base term is set only when he or she has been found suitable for parole.  *In re Dannenberg*, 34 Cal. 4th 1061, 1087 (2005).  Thus, the statutory scheme places individual suitability for parole above a prisoner's expectancy in an early setting of a fixed date designed to ensure term uniformity.  *Id.* at 1070-71.

> While subdivision (a) of section 3041 states that indeterminate life (i.e., life-maximum) sentences should "normally" receive "uniform" parole dates for similar crimes, subdivision (b) provides that this policy applies "*unless* [the Board] determines" that a release date cannot presently be set because the particular offender's crime and/or criminal history raises "*public safety*" concerns requiring further indefinite incarceration. (Italics added.) Nothing in the statute states or suggests that the Board must evaluate the case under standards of term uniformity before exercising its authority to deny a parole date on the grounds the particular offender's criminality presents a *continuing public danger.*

*Id.* at 1070 (emphasis, brackets, and parentheses as in original).  In sum, "the Board, exercising its traditional broad discretion, may protect public safety in each discrete case by considering the dangerous implications of a life-maximum prisoner's crime individually."  *Id.* at 1071.  The California Supreme Court's determination of state law is binding in this federal habeas action.  *See Hicks v. Feiock*, 485 U.S. 624, 629 (1988); *Sandstrom v. Montana*, 442 U.S. 510, 516-17 (1979).

The California Supreme Court also has determined that the facts of the crime alone can support a sentence longer than the statutory minimum, even if everything else about the prisoner is laudable.  "While the board must point to factors beyond the minimum elements of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release."  *Dannenberg*, 34 Cal. 4th at 1071; *see also In re Rosenkrantz*, 29 Cal. 4th 616,

---

[3]      One axis of the matrix concerns the relationship between murderer and victim and the other axis of the matrix concerns the circumstances of the murder.  The choices on the axis for the relationship of murderer and victim are "participating victim," "prior relationship," and "no prior relationship."  The choices on the axis for the circumstances of the murder are "indirect," "direct or victim contribution," and "severe trauma."  Each of the choices are further defined in the matrix.  *See* 15 Cal. Code Regs. § 2403(c).

United States District Court
For the Northern District of California

682-83 (2002) ("[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole" but might violate due process "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense").

## C.      The Board's Decision to Deny Brumett Parole Did Not Violate Due Process.

### 1.      Legal Standards.

Brumett asserts that the Board's decision to deny him parole at the September 2002 hearing violated his Due Process rights.[4]  "In analyzing the procedural safeguards owed to an inmate under the Due Process clause, [a court] must look to two distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural safeguards." *Biggs v. Terhune*, 334 F.3d 910, 913 (9th Cir. 2003).[5]  The second prong of this test is satisfied if: (1) the inmate has been afforded an opportunity to be heard and, if denied parole, informed of the reasons underlying the decision; and (2) the Board's decision is supported "some evidence" or is not otherwise arbitrary. *Hayward v. Marshall*, 512 F.3d 536, 542 (9th Cir. 2008) (citing *Irons,* 505 F.3d at 851 and *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1128-29 (9th Cir. 2006)); *Jancsek v. Oregon Bd. of Parole*, 833 F.2d 1389, 1390 (9th Cir. 1987).

Brumett does not argue that he was denied an opportunity to be heard or that the Board failed to inform him of its reasons for the decision.  Rather, he contends the Board's conclusion

---

[4]      Brumett also theorizes that the Board breached a contract with him and contends that this breach also violates Due Process.  Brumett analogizes his situation to a case where, as part of a plea bargain, the parties agreed the defendant would be released after serving a specified prison term, if the defendant's conduct in prison was disciplinary free. (*See* Pet. Mem. at 26-27 (citing *Brown v. Poole*, 337 F.3d 1155 (9th Cir. 2003).)  The Court finds *Brown* to be inapposite to this case because Brumett did not plead guilty.  To the extent Brumett seeks relief on this basis, his Petition is DENIED.

[5]      In his Answer, Respondent denies that Brumett has a federally protected liberty interest in parole.  (Answer, ¶ 14.)  He does not advance this argument as a basis for denying the petition.  Indeed, that argument would be foreclosed by controlling Ninth Circuit authority.  *See, e.g., Irons*, 505 F.3d at 850 ("California Penal Code section 3041 vests ... all ... California inmates whose sentences provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause."); *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1125 (9th Cir. 2006) ("We hold that California inmates continue to have a liberty interest in parole after *In re Dannenberg*, 34 Cal. 4th 1061 (2005).").

United States District Court
For the Northern District of California

13

that he would pose an unreasonable risk of danger to society if released is both arbitrary and not supported by "some evidence."  Respondent argues that the "some evidence" standard is not clearly established federal law.  That argument is foreclosed by Ninth Circuit authority.  *See Sass*, 461 F.3d at 1129.  Respondent further argues, that even if the "some evidence" standard applies, the Board's decision that Brumett posed an unreasonable danger to society was supported by some evidence.

"To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence.  Instead, the relevant question is whether there is any evidence in the record that could support the conclusion' reached by the parole board."  *Sass*, 461 F.3d at 1128 (quoting *Superintendent v. Hill*, 472 U.S., 445, 455-56 (1985)).  "*Hill*'s some evidence standard is minimal and assures that 'the record is not so devoid of evidence that the findings of the disciplinary board were without support or otherwise arbitrary.'"  *Id.* at 1129 (quoting *Hill*, 472 U.S. at 457).  Further, in order to determine whether the Board's decision to find Brumett unsuitable for parole is supported by some evidence, this Court must focus not on whether some evidence "that a particular factor or factors indicating unsuitability exist," but on whether there is some evidence to conclude that "a prisoner's release will unreasonably danger public safety."  *Hayward*, 512 F.3d at 543 (citations omitted).

**2.   Analysis.**

At the hearing, the Board found Brumett unsuitable for parole and an unreasonable risk or danger to others if released based on the following findings: (1) the commitment offense was carried out in an especially cruel and callous manner; (2) the motive of the crime was inexplicable or very trivial in relationship to the offense; (3) his previous record demonstrated that Brumett had an escalating pattern of criminal conduct; (4) that Brumett had a history of unstable and tumultuous relationships with others; (5) Brumett had not sufficiently participated in beneficial self-help and therapy programming; and (6) Dr. Gamard's report was not totally supportive of release.

United States District Court

For the Northern District of California

### a.     The Nature of the Offense.

The first Section 2402 factor on which the Board relied to find Brumett unsuitable for parole is that he "committed the offense in an especially callous manner."  15 Cal. Code Regs. § 2402(c)(1).  "A prisoner's commitment offense may constitute a circumstance tending to show that a prisoner is presently too dangerous to be found suitable for parole, but the denial of parole may be predicated on a prisoner's commitment offense only where the Board can 'point to factors beyond the minium elements of the crime for which the inmate was committed' that demonstrate the inmate will, *at the time of the suitability hearing*, present a danger to society if released."  *Irons*, 505 F.3d at 852 (quoting *Dannenberg*, 34 Cal. 4th at 1071) (emphasis added).

Here, the Board noted that Brumett had prior knowledge that he had an alcohol problem and refused to acknowledge that problem.  (Pet., App. A, Ex. C (Tr. at 90:18-19.)  The Board also noted that multiple victims were injured, one of the factors to be used to determine whether a "prisoner committed the offense in an especially heinous, atrocious or cruel manner."  15 Cal. Code Regs. § 2402(c)(1)(A).  The Board also concluded that the offense was "carried out in a dispassionate and calculated manner," because Brumett was driving under a suspended license and had previous DUI arrests.  (Pet., App. A, Ex. C (Tr. at 90:25-91:3).)  *See also* 15 Cal. Code Regs. § 2402(c)(1)(B).  The Board further concluded that the "offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering (*see id.* § 2402(c)(1)(D)), because Brumett left two young children motherless.  (Pet., App. A, Ex. C (Tr. at 91:4-8.)  Finally, the Board concluded the motive for the crime was trivial in relation to the offense (*see* 15 Cal. Code Regs. § 2402(c)(1)(E)), because Brumett did not heed the warning signs of his problem with alcohol.  (Pet., App. A, Ex. C (Tr. at 91:13.)

As noted, Brumett was convicted of second degree murder, which by its nature evinces a certain level of callousness because it "requires express or implied malice – i.e., the perpetrator must kill another person with the specific intent to do so; or he or she must cause another person's death by intentionally performing an act, knowing it is dangerous to life and with conscious disregard for life."  *In re Smith*, 114 Cal. App. 4th 343, 366 (2003).  As the *Smith* court noted, "[f]or this reason, it can reasonably be said that *all* second degree murders by definition involve

1   some callousness – i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the

2   feelings or suffering of others." *Id.* (emphasis in original). "Therefore, to demonstrate 'an

3   exceptionally callous disregard for human suffering' ... the offense in question must have been

4   committed in a more aggravated or violent manner than that ordinarily shown in the commission

5   of second degree murder." *In re Scott*, 119 Cal. App. 4th 871, 891 (2004) (citations omitted).

6           In *Irons*, *supra*, the petitioner killed the victim following an argument over a suspected

7   drug theft. Irons fired twelve rounds into the victim and, after the victim complained that he was

8   in pain, Irons stabbed him twice in the back. Irons then wrapped the victim's body in a sleeping

9   bag, and attempted to procure a car. During the ten days it took Irons to obtain a car, he left the

10  victim's body in a room in the sleeping bag. Thereafter, Irons took the victim's body to the coast,

11  weighted it, and disposed of it in the ocean. *Irons*, 505 F.3d at 849. The *Irons*' court compared

12  the facts of Irons' commitment offense to the facts of the commitment offense in *Dannenberg*, in

13  which the petitioner "struck multiple blows to his wife's head with a pipe wrench and then pushed

14  her into a tub of water in which she drowned." *Id.* at 852. The *Irons* court concluded that

15  "[b]ecause we find that Irons' crime was similarly cruel or vicious [to Dannenberg's crime], we

16  cannot say that there was not 'some evidence' to support the Board's determination that Irons was

17  unsuitable for parole under California law." *Id.*

18          It is undisputed in this case that multiple victims were involved and that one was critically

19  injured and one was killed. It also is undisputed that Brumett consumed alcohol before getting

20  into the car to pick up his daughter from school so that his blood alcohol level at the time of the

21  accident was well above the permitted limit. Brumett acknowledges that he was in denial about

22  his problem with alcohol for practically all of his adult life. (Pet., App. A, Ex. C (Tr. at 17:22-

23  27).) Although he stated that he was not clear on the events following the collision, Brumett also

24  admitted that he tossed beer cans over the embankment while waiting for police to arrive. (*Id.* at

25  18:1-8.) Although Brumett may not have intended to kill anyone on the day of the offense, he

26  clearly demonstrated he had ignored the potential perils of driving under the influence on a number

27  of prior occasions. As such, although the facts of this case might not be as egregious as the facts

28  of *Irons*, the Court concludes that the State Court's decision was neither an unreasonable

1   application of clearly established federal law nor was it based on an unreasonable determination of

2   facts in light of the evidence presented.

3                    **b.    Brumett's Previous Convictions.**

4           The Board determined that Brumett demonstrated an escalating pattern of criminal

5   conduct because, although he had no juvenile record, he had three prior DUIs and failed to benefit

6   from treatment.  (Pet., App. A, Ex. C (Tr. at 91:17-18).)  Section 2402(c)(2) notes that if a

7   "prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim," that

8   factor would tend to show unsuitability for parole.

9           Brumett was convicted for a DUI on April 3, 1987 and placed on 36 months probation.

10  (Pet., App., Ex. A at 26 (Life Prisoner Evaluation Report).)  His driving privileges were restricted

11  for 90 days and he was directed to attend a driver improvement program for a DUI treatment

12  program.  (*Id.*)  Brumett was again convicted of a DUI on May 3, 1987 for which the court placed

13  him on probation for 48 months, sentenced him to 48 hours in county jail, fined him $664.00,

14  directed him to participate in treatment or counseling and restricted his driving privileges for one

15  year.  He was also ordered to attend AA meetings.  (*Id.*)  On November 8, 1988, Brumett was

16  again convicted for a DUI and placed on probation for 60 months.  (*Id.*)  On June 29, 1989,

17  Brumett was convicted for Hit and Run with Injury and Driving on a Suspended License.  (*Id.*)  He

18  was sentenced to 68 hours in County Jail and placed on 36 months court probation.  (*Id.*)  He was

19  ordered not to drive a motor vehicle unless licensed and insured.  (*Id.*)  The Board concluded that

20  these prior convictions demonstrated that Brumett failed benefit from society's previous attempts

21  to rehabilitate him and demonstrated that he could not be "counted upon to avoid criminality."

22  (Pet., App. A, Ex. C (Tr. at 92:3-7).)

23          With the exception of the conviction for a hit and run with injury, Brumett's prior

24  convictions do not lead to the conclusion that he has a history of inflicting or attempting to inflict

25  serious injury on a victim.  In light of the hit and run conviction, the Court cannot find that the

26  State Court's decision, which concluded that the Board's decision to find Brumett unsuitable for

27  parole was supported by some evidence, was contrary to or an unreasonable application of clearly

28  established federal law.

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1

        **c.**     **Brumett's Need for Continued Self-Help and Therapy.**

2           The Board also based its denial on its determination that Brumett needs to continue with

3  therapy and self-help programming.  Brumett has remained disciplinary free for his entire nine

4  years of incarceration.  He has participated in Alcoholics Anonymous and Narcotics Anonymous

5  programs.  He has participated in, and completed, a Life Skills program for which he received a

6  certificate.  He completed the Impact Program Workshop, in which he remains as a tutor and an

7  instructor.  He also completed the Anger Management Program.  He obtained a Refrigeration and

8  Air Conditioning certificate.  He also received a certificate for Type II Refrigerant and Transition

9  Recovery.  He has obtained a Pasteurization license, which he renewed in December of 2001.  He

10  worked as a sewing machine operator.  He was also working towards his AA in Business

11  Management.  He continues to receive positive work reports.

12           Furthermore, the Staff Psychologist, Dr. Gamard, stated in his evaluation that Brumett

13  "would pose less than an average risk of violence when compared to other Level II inmates.  And

14  that if released to the community, [Brumett's] violence potential is estimated to be no higher than

15  the average citizen in the community," which one of the Commissioners found "raise[d] a flag in

16  [his] own experience."  (Pet., App. A, Ex. C (Tr. at 34:9-12).)  Dr. Gamard also noted that the

17  "only risk factor, precursor for problems in the future, when released on parole, would be if

18  [Brumett] were to return to alcohol use."  (*Id.* at 34:22-25.)  Finally, Dr. Gamard noted in his

19  report that Brumett "is responsible for his behavior.  He has no mental health disorder which

20  would necessitate any treatment, either while incarcerated or on parole."  (*Id.* at 34:27-35:3.)  Dr.

21  Gramard's only recommendation was that "since severe alcoholism is considered to be a disease or

22  a lifetime condition, which must be guarded against, [Brumett] would need a 12-Step or some

23  other support system should he be released."  (*Id.* at 35:3-8.)  The Board, however, found that

24  because Dr. Gamard noted that Brumett's return to alcohol would be a risk factor upon his release,

25  the report was not totally supportive of release.  (*Id.* at 92:15-23.)[6]  The Court concludes that the

26

27          [6]    Brumett also alleges that the Board cannot rely on his history with
28  alcoholism to deny him parole.  (Pet. Mem. at 54-56.)  This Court finds, however, that the
Board did not rely on his alcoholism as a factor to deny Brumett parole.  Rather, the Board
relied on Brumett's disregard for the problem as demonstrated by his DUI violations.

United States District Court

For the Northern District of California

1   State Court's determination that the Board's decision that Brumett's need for continued self-help

2   or therapy and programming presents some evidence showing that he still poses a danger to

3   society was not contrary to or an unreasonable application of clearly established federal law.

4               **d.    Unstable Social History.**

5            The Board also stated that it deemed Brumett unsuitable for parole based upon his

6   tumultuous or unstable relationships with others. *See* 15 Cal. Code Regs. § 2402(c)(3).  The

7   record demonstrates that Brumett is divorced and does not have regular contact with his daughter,

8   although that apparently is not his choice.  The Board also noted that Brumett began drinking

9   when he was about 13, apparently as a result of his father's death.  The Board also relied on the

10  fact that Brumett failed to heed previous grants of probation, counseling and jail time or

11  acknowledge that he had a problem, "and cannot be counted to avoid criminality."  However, the

12  record also demonstrates that Brumett's family is quite supportive of him and has maintained close

13  contact with him while he has been incarcerated, and is ready to support him upon release.

14  Although it is not this Court's task to reweigh the evidence, the Court concludes that the record

15  does not support a finding that Brumett's relationships with others demonstrate that he would pose

16  an unreasonable risk of danger to society if released.  *See Hayward*, 513 F.3d at 546.

17           However, when the Court looks to the record as a whole, the Court finds that the State

18  Court's determination that there was some evidence to support the Board's decision to find

19  Brumett unsuitable for parole, was not contrary to and did not involve an unreasonable application

20  of clearly established federal law.  Accordingly, Brumett's petition is DENIED on this basis.

21               **e.    The Concerns Articulated in *Biggs v. Terhune* Are Not Implicated In**
                 **this Case.**

22

23           In *Biggs*, the Ninth Circuit stated that,

24           [o]ver time, ... , should Biggs continue to demonstrate exemplary behavior
             and evidence of rehabilitation, denying him a parole date simply because of
25           the nature of his offense would raise serious questions involving his liberty
             interest. ...
26
             A continued reliance in the future on an unchanging factor, the circumstance
27           of the offense and conduct prior to imprisonment, runs contrary to the
             rehabilitative goals espoused by the prison system and could result in a due
28           process violation.

United States District Court
For the Northern District of California

1   *Id.* at 916-17; *cf. Dannenberg*, 34 Cal. 4th at 1094 ("sole reliance on the commitment offense

2   might, in particular cases, violate" section 3041(a)'s "provision that a parole date 'shall normally

3   be set' under 'uniform term principles, and might thus also contravene the inmate's

4   constitutionally protected expectation of parole"); *Rosenkrantz*, 29 Cal. 4th at 682-83 ("[t]he

5   nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole" but

6   might violate due process "where no circumstances of the offense reasonably could be considered

7   more aggravated or violent than the minimum necessary to sustain a conviction for that offense").

8       In issuing the note of caution in *Biggs* regarding continued reliance on unchanging factors,

9   the Ninth Circuit gave little guidance to district courts as to how they should evaluate such a claim.

10  In *Irons,* however, the court noted that when it had determined that "a parole board's decision to

11  deem a prisoner unsuitable for parole solely on the basis of his commitment offense comport[ed]

12  with due process, the decision was made before the inmate had served the minimum number of

13  years required by his sentence." *Id.*  The court concluded that "[a]ll we held in [*Biggs* and *Sass*,]

14  and all we hold today, therefore, is that, given the particular circumstances of the offenses in these

15  cases, due process was not violated when these prisoners were deemed unsuitable for parole prior

16  to the expiration of their minimum terms." *Id.* at 853-54.  The *Irons* court further "expressed its

17  hope that the Board will come to recognize that in some cases, indefinite detention based solely on

18  an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point

19  violate due process, given the liberty interest in parole that flows from the relevant California

20  statutes." *Id.* at 854.

21      The lessons this Court draws from *Biggs*, *Sass*, *Irons, Dannenberg, Rosencrantz*, and

22  various district court opinions that have applied the principles articulated therein,[7] are as follows:

23

24      [7]     *See, e.g., McCullough v. Kane*, 2007 WL 1593227 at *6, 9 (N.D. Cal. June 1,
    2007) (finding due process violation in Governor's reversal of the Board's decision to grant
25  parole after petitioner had served twenty-one years of fifteen years to life sentence for second
    degree murder and met circumstances tending to indicate suitability for parole); *Brown v.
26  Kane*, 2007 WL 1288448 at *1 (N.D. Cal. May 2, 2007) (finding due process violation in
    Governor's reversal of the Board's decision to grant parole at tenth parole suitability hearing
27  after petitioner had served twenty-four years of fifteen years to life sentence for second
    degree murder and met circumstances tending to indicate suitability for parole); *Pirtle v. Cal.
28  Bd. of Prison*, 2007 WL 1140817 at *3 (E.D. Cal. Apr. 17, 2007) (finding due process
    violation in Board's denial of parole based on petitioner's commitment offense, criminal

**United States District Court**
For the Northern District of California

1  (1) that the Board may properly consider the nature of the commitment offense to determine

2  whether or not a prisoner is suitable for parole; (2) that in certain instances the nature of the

3  offense alone may support a finding that the prisoner is unsuitable for parole; and (3) at some

4  unspecified point, the nature of the offense will no longer be of sufficient predictive value in

5  determining whether or not a prisoner poses too great a risk of danger to be considered suitable for

6  parole.

7          In his Petition, Brumett challenges the Board's actions at his *first* suitability hearing,

8  which occurred *nine* years into a fifteen year to life sentence.  Thus, Brumett has not yet served his

9  minimum sentence and the Court finds that the State Court's rejection of his Due Process claims

10 was not contrary to or an unreasonable application of clearly established federal law.  Although at

11 some point in the future, the Board's reliance on unchanging factors may implicate *Biggs*, those

12 concerns are not raised by this Petition.[8]  Brumett's Petition is DENIED on this basis as well.

13 **D.      Brumett's Claim That the Board Operates Under a No-Parole Policy is Moot.**

14         Brumett contends that, under former Governor Gray Davis's administration, the Board

15 implemented a policy in which it denied parole to prisoners who had been sentenced to

16 indeterminate terms.  Although the State Court did not address this claim, it is moot.  Even if, as

17 Brumett asserts, a policy existed under the former Governor's administration, the proper relief

18 would be to grant him a new hearing before a Board unaffected by the policy.  *See, e.g., Rush v.*

19 *Kane*, 2007 U.S. Dist. LEXIS 89259, n.5 *25 (N.D. Cal. 2007); *Coleman v. Board of Prison*

20 *Terms,* 2004 U.S. Dist. Lexis 29929, *12-13 (E.D. Cal. 2004), *aff'd*, 228 Fed. Appx. 673 (9th Cir.

21 2007)).  Brumett acknowledged that he has received at least two additional hearings under

22

23 ─────────────────
   record, unstable social history, failure to upgrade vocationally, and need for further therapy
24 to cope with stress), *report and recommendation adopted* 2007 WL 15446620 (E.D. Cal.
   May 29, 2007); *Thomas v. Brown*, 513 F. Supp. 1124 (N.D. Cal. 2006) (finding due process
25 violation in Governor's reversal based on petitioner's commitment offense, his failure to
   accept responsibility, his need for further therapy, and his criminal history).

26         [8]      Brumett also alleges that his incarceration has become disproportionate to
   offenses committed under similar circumstances.  (Pet. Mem. at 62-66.)  However, the Board
27 has not yet found Brumett suitable for parole.  Pursuant to the California Supreme Court's
   decision in *Dannenberg*, a determination of suitability precedes a determination of the
28 appropriate matrix term.  Accordingly, the Court finds this claim without merit and DENIES
   the Petition on that basis as well.

1   Governor Schwarzenegger's administration.  Thus, because there is no evidence that suggests the

2   alleged "no parole" policy carried over into Governor Schwarzenegger's administration, Brumett

3   already has been provided additional fair hearings.  Accordingly, this claim is DENIED AS

4   MOOT.  *Rush,* 2007 U.S. Dist. LEXIS 89259 at *25.

5   **CONCLUSION**

6   For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.  A separate

7   judgment shall issue, and the Clerk shall close the file.

8

9   **IT IS SO ORDERED.**

10

11   Dated:   March 28, 2008                                    _____

12                                                                          JEFFREY S. WHITE
                                                                            UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California